Stephen Wood (USB #12403)
Grace Pusavat (USB #15713)
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
(801) 515-7300
stephenwood@quinnemanuel.com
gracepusavat@quinnemanuel.com

David Y. Livshiz (admitted *pro hac vice*)
Linda H. Martin (admitted *pro hac vice*)
Timothy T. Howard (admitted *pro hac vice*)
Noelle Williams (admitted *pro hac vice*)
**FRESHFIELDS US LLP**
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, New York 10007
(212) 277-4000
david.livshiz@freshfields.com
linda.martin@freshfields.com
timothy.howard@freshfields.com
noelle.williams@freshfields.com

*Attorneys for Varex Imaging Corporation and*
*Varex Imaging Deutschland AG*

---

# THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| VAREX IMAGING CORPORATION and VAREX IMAGING DEUTSCHLAND AG, <br><br> *Plaintiffs*, <br><br> v. <br><br> HOUMAN JAFARI, CETTEEN GMBH, H&P ADVANCED TECHNOLOGY GMBH, ESSPEN GMBH, and H&S HOLDING UG, <br><br> *Defendants*. | Case No. _____ <br><br> **COMPLAINT** <br><br> **JURY DEMANDED** |

Plaintiff Varex Imaging Corporation ("Varex U.S.") and Plaintiff Varex Imaging Deutschland AG ("Varex Germany", and collectively with Varex U.S., "Varex"), by and through their undersigned counsel Freshfields US LLP, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## INTRODUCTION

1.     For more than a decade, defendant Houman Jafari, acting through his alter-ego entities, including CETTEEN GmbH ("CETTEEN"), H&P Advanced Technology GmbH ("H&P"), ESSPEN GmbH ("ESSPEN"), and H&S Holding UG ("H&S") (collectively, "Jafari"), has engaged in a continuing scheme to improperly obtain, misappropriate, and illegally use intellectual property owned by his business partners and competitors. For years, Jafari—who is an electrical engineer not trained in the physics of nanotubes—would hold himself out as an expert and leader in the development of cutting-edge carbon nanotube technologies, including, among others, to U.S. companies. In fact, Jafari was nothing more than a garden variety con-man, using the access he gained to others' intellectual property to seize it for himself so he could generate profits off the laundered IP that he had stolen.

2.     Jafari wanted to do something no one else had ever achieved. He wanted to monetize carbon nanotubes for use in the x-ray industry and become the recognized leader in the field. But Jafari had a problem. As an electrical engineer, he did not have the deep knowledge of

---

[1] Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to, a review and analysis of: (i) court filings; (ii) interviews with current and former Varex employees; (iii) interviews with former associates of Houman Jafari; and (iv) other public information and data. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

material sciences necessary to perfect the nanotube. So Jafari devised a scheme whereby he moved strategically between employers and other business relationships with actual industry experts and expertise, all with one singular goal: to exploit them so he could pilfer as much intellectual property as possible. Jafari would then use the stolen IP to induce his next counterparty into a business relationship so he could then, in turn, steal that counterparty's intellectual property.

3.      Jafari advanced this scheme through his complex web of corporate alter-egos, which includes CETTEEN, H&P and ESSPEN, to create a veneer of legitimacy and induce industry leaders into contracting with him. Once these agreements were signed, Jafari, acting in concert with other members of his RICO enterprise, including Phat Tran ("Tran"), Jens Peter Wartmann ("Wartmann"), and Zahra Mohammadi ("Mohammadi"), would do everything in his power to take as much intellectual property as he could, while simultaneously contributing nothing of his own. In one instance, Jafari and Tran leveraged Jafari's employment with XinRay Systems, LLC, a North Carolina business, to learn and steal their intellectual property—before Jafari deleted emails and digital records in an effort to cover his tracks. Other times, he would pocket the work of one of his collaborators to pass it off as his own for his next venture, while lining his pockets with proceeds from each partnership.

4.      Varex is only the most recent victim of Jafari's reign of thievery. Varex is the world's largest independent supplier of medical x-ray tubes, digital detectors, and other imaging solutions. Its components are used in medical imaging, cargo screening, and border security systems.

5.      In 2016, Varex was looking to develop carbon nanotube x-ray tubes to help it grow its already existing business relationships with leading providers of imaging services such as

Smiths Detection and Siemens Healthcare.  It was in this context that Sunny Sanyal, Varex's CEO, was introduced to Jafari.  In Jafari, Varex saw an opportunity to expand its market leading position into a new space: nanotube technology for x-ray use.  In Varex, Jafari saw his next patsy.

6.     On November 22, 2018, Varex U.S. caused Varex Germany to enter into a joint venture agreement ("JVA") with CETTEEN, Jafari, and H&P.  Together, the parties formed VEC Imaging GmbH & Co. KG ("VEC") to develop, produce, and sell x-ray imaging components and systems based on nanotube technology.  Varex contributed tube design expertise and cash to the joint venture, whereas Jafari was to contribute his expertise (he purportedly knew how to design emitters using carbon nanotube technology that could be used inside of x-ray tubes), his IP (which he was expected to license to VEC), and his time (in his appointed role as VEC's CEO).

7.     But unbeknownst to Varex, Jafari never intended for the joint venture with Varex to succeed.  Jafari lured Varex in, obtaining commitments from Varex to contribute millions of euros in financing, the time of skilled Varex U.S. engineers, and prototype manufacturing resources.  In return, Jafari made empty promises to Varex, including that he would convey intellectual property that Jafari falsely claimed to own.  Once he had lured Varex into the arrangement, he then exploited the joint venture for his personal gain through his various alter-egos, by causing VEC to enter multiple business relationships with third parties—including some without Varex's knowledge or approval, in blatant violation of the joint venture agreement.  Having gained access to Varex's intellectual property, Jafari then scared off those same third-party business partners with misrepresentations about Varex, attempting to destroy Varex's reputation in the niche x-ray industry.  This behavior harmed both the VEC joint venture and Varex's relationship with long-term customers.

8.      Jafari's continued mismanagement of VEC as an arm of his personal empire and for his personal interest resulted in VEC suffering financial crisis after financial crisis.   In a desperate effort to make the relationship with Jafari work and to keep VEC from crumbling, Varex Germany—still unaware of Jafari's scheme—made five cash infusions in the form of loans totaling nearly 1 million euros within less than 18 months.   Several of these loans are now past due, but Jafari has refused to pay, and more than €535,000 is still outstanding.   To make matters worse, while the relationship was still functioning, VEC procured valuable goods and services from Varex.   But, when it came time to pay, Jafari—again—refused.

9.      After having squeezed Varex for all that he could, on September 16, 2024, Jafari's alter ego CETTEEN purported to terminate the VEC joint venture.   He then caused VEC's website to be shut down and VEC's assets went missing.   Shortly before terminating the JVA, Jafari created a new entity—H&S Holding UG—of which he is the sole shareholder.   Using H&S, Jafari intends to continue to misappropriate VEC's and Varex's intellectual property.

10.      Although Jafari is the mastermind behind this fraudulent scheme, he had help. Jafari placed his henchman Tran in leadership positions within several of his companies to do Jafari's bidding.   First, Tran was the frontman of H&P when Jafari didn't want his former employer to know about his self-dealing.   Then Jafari inserted Tran as managing director of VEC after Jafari himself stepped down.   And Tran acts as the sole Managing Director of Jafari's alter ego CETTEEN.

11.      Jafari even drew his own wife, Zahra Mohammadi, into the fraudulent web, by convincing Mohammadi, a chiropractor by training with no physics, engineering, or technological

background, to identify herself as the inventor on several patents related to nanotube technology. He also installed her as the Project Manager of ESSPEN.

12.     Jafari's scheme also involved Jens Peter Wartmann, Chief Financial Officer of VEC since 2022, who, on Jafari's instruction, wrote letters on behalf of VEC falsely disparaging Varex to one of its key customers.

13.     Jafari holds himself out as a distinguished scientist and entrepreneur.  In reality, he is the intellectual property equivalent of Charles Ponzi, stealing IP from one party and using it to induce his next victim so he can in turn steal more intellectual property in an ever-repeating cycle. For years, Jafari sought to take advantage of Varex's intellectual property and financial resources, all for his own personal gain and just as he had done with other victims before Varex.  The time has come for Jafari to be held accountable.  That is what Varex asks here.

## PARTIES

### I.  PLAINTIFF

14.     Plaintiff **Varex Imaging Corporation** is a corporation duly organized and existing under the laws of Delaware, having a registered office at 251 Little Falls Drive, Wilmington, DE 19808 and a principal place of business at 1678 South Pioneer Road, Salt Lake City, Utah 84104. Varex U.S. designs and manufactures x-ray tubes and detectors for medical and security related applications.

15.     Plaintiff **Varex Imaging Deutschland AG** is a German incorporated company and a wholly owned subsidiary of Varex U.S. Varex Germany has a principal place of business at Otto-Brenner-Straβe 10, 47877 Willich, Germany.

## II.   DEFENDANTS

16.   Defendant **Houman Jafari** is a citizen of the United States and resides at Marie-Curie-Straße 17, 91052 Erlangen, Germany.  Jafari is a 50% shareholder of H&P and the beneficial owner of CETTEEN.   Jafari was nominated by CETTEEN as its sole Managing Director of the VEC joint venture, as explained below.  Jafari owns and operates CETTEEN, H&P, ESSPEN and H&S as alter egos.

17.   Defendant **H&P Advanced Technology GmbH**, an alter ego of Jafari, is a German limited liability company with a principal place of business at Henkestraße 91, 91052 Erlangen, Germany.   H&P holds itself out as performing engineering services, including developing and inspecting electronics, components, systems, and materials for the automotive, crude oil and natural gas sectors, as well as for the medical services and security services sectors.   Jafari is a 50% shareholder of H&P.   The other 50% is held (at least nominally) by Phat Tran—with "**H**ouman" Jafari being the "H" and "**P**hat" Tran being the "P" in H&P.   Throughout, Tran acted as Jafari's co-conspirator in connection with his scheme to steal the intellectual property of Jafari's counterparties.   H&P, in turn, is nothing more than a vehicle used by Jafari to contract with others, using H&P's corporate form and few assets to steal and hide intellectual property, as well as to shield himself from liability.

18.   Defendant **H&S Holding UG**, an alter ego of Jafari, is a limited liability company registered in Germany with a principal place of business at Marie-Curie-Straße 17, 91052 Erlangen, Germany, the address Jafari previously listed as his personal residence.  H&S's purpose is to hold Jafari's assets, and he is the sole shareholder and Managing Director.

19.     Defendant **CETTEEN GmbH**, an alter ego of Jafari, is a corporation registered in Germany with a principal place of business at Zeppelinstraße 15, 91052 Erlangen, Germany. CETTEEN holds itself out as being in the business of developing, promoting, and selling medical systems, software, and intellectual property, as well as managing its own assets and providing business consultancy services.  Jafari is the beneficial owner of CETTEEN, the shares of which are held in trust by ESSPEN GmbH for the shareholders of H&P.  Tran is a Managing Director of the company.  CETTEEN is nothing more than a vehicle used by Jafari to contract with others, using CETTEEN's corporate form and few assets to steal and hide intellectual property, as well as to shield himself from liability.

20.     Defendant **ESSPEN GmbH**, an alter ego of Jafari, is a German limited liability company with a principal place of business at Zeppelinstraße 15, 91052 Erlangen, Germany. ESSPEN holds itself out as a management company that is managing its own assets (in particular the taking and holding of shareholdings at home and abroad) and engaged in management consulting.  ESSPEN holds 100% of the shares in CETTEEN in trust for the ultimate benefit of Jafari and Phat.  ESSPEN is nothing more than a vehicle used by Jafari to contract with others, using ESSPEN's corporate form and few assets to steal and hide intellectual property, as well as to shield himself from liability.

21.     The shared address of CETTEEN and ESSPEN is just one example of the many ways in which these companies were nothing more than Jafari's alter egos.  Notably, that is also the address of Jafari's personal lawyer, Benedikt Salleck of Salleck + Partner.  A Google Maps

search shows the sign for Salleck + Partner outside of this address.[2]  However, there are no signs for CETTEEN or ESSPEN.

## JURISDICTION AND VENUE

22.    This Court has federal-question jurisdiction over Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), pursuant to 28 U.S.C. § 1331, the Defend Trade Secrets Act ("DTSA"), pursuant to 18 U.S.C. § 1836, and the Copyright Act, pursuant to 17 U.S.C. § 506.  This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same nucleus of operative facts.

23.    This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965 and Utah Code Ann. § 78B-3-205 because Defendants have transacted business and engaged in fraudulent conduct in the United States generally and in Utah in particular.  Plaintiffs' claims arise from that tortious and fraudulent conduct.  On multiple occasions, Jafari, acting on his own behalf and as agent and representative of CETTEEN (the 100% subsidiary of ESSPEN) and H&P, traveled to the United States to meet with Varex in Utah for the purposes of inducing Varex to enter into the VEC joint venture, to finalize the JVA, and to discuss the progress of the joint venture.  Jafari also visited the United States to meet with other companies in the nanotube space in connection with his partnership with Varex.  *See infra* ¶¶ 90-103.  Defendants have also engaged in intentional, wrongful, and illegal acts, the effects of which Defendants knew and intended would be felt in the United States and in Utah.  To the extent that Defendants are not otherwise subject to personal jurisdiction in any state's court in the United States, personal jurisdiction over

---

[2]   Google   Maps   search   for   "Zeppelinstraße   15,   91052   Erlangen,   Germany,"
https://tinyurl.com/bdhzbca4 (last visited Oct. 18, 2024) (Google Street View).

Defendants in this Court is also proper under Federal Rule of Civil Procedure 4(k)(2).  Defendants CETTEEN, H&P, ESSPEN and H&S are also subject to this Court's jurisdiction because they are alter egos controlled and dominated by Jafari.

24.    Personal jurisdiction extends to Defendants pursuant to Utah's long-arm statute that submits to jurisdiction in Utah any person who "transact[s] . . . any business within th[e] state" or "caus[es] . . . injury within th[e] state, whether tortious or by breach of warranty."  Utah Long-Arm Statute, Utah Code Ann. § 78B-3-205(1), (3).

25.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Plaintiff Varex U.S. is based in the United States.  Specifically, Varex U.S. has its principal place of business in Salt Lake City, Utah.  Venue is further proper because a substantial portion of the harm suffered by Plaintiffs occurred in this district and Defendants transacted their affairs in this judicial district.  Defendants engaged in conduct availing themselves of the privilege of conducting business in Utah, used instrumentalities located in this judicial district to carry out acts alleged in this Complaint, and engaged in overt acts in this judicial district in furtherance of the RICO conspiracy alleged herein.

## FACTUAL ALLEGATIONS

26.    Until the discovery of carbon nanotubes ("CNT"), techniques applied to the engineering of x-ray tubes had remained relatively unchanged since 1895.  In conventional x-ray machines, the x-ray tube uses a metallic filament that is heated to over 2,000 degrees Celsius to emit electrons.  These electrons shoot down the tube and collide with a piece of metal which produces x-rays.  This process generates a lot of heat, demands a tremendous amount of energy

for modern commercial machines, and is very inefficient. As a result, conventional x-ray machines are large, bulky, and not easy to transport.

27.     A CNT emitter is a hollow cylindrical structure made of rolled-up sheets of carbon atoms arranged in a unique lattice pattern. The structure itself has a diameter measuring on the nanometer scale (which is one-billionth of a meter). They have unique and diverse properties such as high stability, low weight, and optimal electrical, thermal, and mechanical properties, and are stronger than steel while being thinner than a strand of hair.

28.     CNTs can be used across a diverse range of industries and show especially great promise for x-ray applications in medical and security imaging. In the x-ray context, they are used to replace the traditional metal filament emitter inside of the x-ray tube, making medical x-ray machines and airport security scanners more efficient, cheaper, and portable for commercial use. There are two main reasons for this. First, unlike a traditional heated metal filament-based emitter, the physical properties of a CNT emitter allow it to emit electrons at room temperature when exposed to an electric field. Reducing the heat within the x-ray tube means that these emitters can be placed closer together, improving image quality. Furthermore, these emitters are actuated by an electric field rather than heat, allowing x-rays to be generated faster and more efficiently. Second, CNT emitters can be used to create an x-ray tube with multiple emitters that fire independently from one another, whereas traditional x-ray tubes only contain a single emitter. This allows for more complex x-ray images to be taken by a smaller and portable x-ray machine. It also enables an x-ray machine to produce an image taken from several distinct angles without having to move or rotate the machine.

29.     For example, existing security scanners at airports generate 3-D images using a single x-ray tube that slowly rotates around a big piece of luggage, gathering images from different projections.  CNT technology allows for the potential to create an x-ray machine with no moving parts that produces an even higher resolution image than an x-ray machine made with a conventional x-ray tube.

30.     Medical care will also be improved.  For example, x-ray machines used today are so slow that they cannot take images and treat the patient at the same time.  CNT technology may make it possible to view 3-D images of a patient's tumor while also ensuring that high-dose radiation is delivered to the right place in the patient's body.

31.     Potential applications of CNT emitter-based x-rays, which have been studied for decades, continues to be a rapidly growing industry that is still being improved and developed for commercial use.  X-ray technologies touch on almost every area and aspect of science and industry, creating considerable global interest for the realization of low energy, real-time x-ray imaging techniques.  The global market value of diagnostic imaging systems alone is anticipated to surpass $47 billion by 2024.[3]  Hence, CNTs' future potential in x-ray tubes is exceptionally valuable.  It was with this in mind that Varex sought to partner with Jafari to create a joint venture in this space. Little did Varex know that it was dealing with a cheat and a scammer.

**Jafari's History of Misappropriating His Former Employers' IP**

32.     Born in 1972, Jafari is an Iranian-German electrical engineer.  In 2004, Jafari defended his dissertation in electrical engineering and graduated from FAU Erlangen-Nürnberg.

---

[3]     STATISTA, https://www.statista.com/outlook/hmo/medical-technology/medical-devices/diagnostic-imaging-devices/worldwide (last visited Oct. 18, 2024).

After graduation, Jafari joined the German conglomerate Siemens as a Senior R&D/Project Manager.  In this role, Jafari was responsible for working on a high energy radio frequency power amplifier—essentially, the energy source used in cancer radiation therapy.  Neither during his time at Siemens, nor in his prior jobs, did Jafari work on anything related to carbon nanotube materials or how these materials can be used to develop emitters for potential x-ray applications.

33.     On September 18, 2007, Siemens entered into a joint venture with Xintek, Inc. ("Xintek").  As part of that joint venture, Siemens was required to provide the joint venture—named XinRay Systems, LLC ("XinRay")—with three full time fee earners.  Jafari would become one of the fee earners.  On January 5, 2009, Houman Jafari left his employment with Siemens and joined XinRay, relocating to North Carolina.   In 2011, Xintek acquired Siemens's interest in XinRay, but Jafari stayed behind.

34.     XinRay developed and produced carbon nanotube multibeam x-ray sources for use in imaging systems in high performance next-generation security, healthcare, and industrial testing applications, such as medical x-ray diagnostic applications and airport screening systems for carry-on luggage.

35.     Initially, Jafari was responsible for overseeing programs dealing with high voltage electronics development that Siemens was performing for XinRay.   Jafari was never directly responsible for x-ray tube or carbon nanotube materials, or emitter design, during his tenure.

36.     In April of 2010, Jafari abused his position as Project Manager at XinRay to manipulate XinRay into entering a relationship with H&P to develop electronic control technology—in other words, the power source for the nanotubes.  Specifically, Jafari—who was responsible for sourcing companies for XinRay to partner with to develop electronics—claimed to

XinRay that the Siemens solution was "technically insufficient and economically unacceptable." Going a step further, Jafari misrepresented that H&P was the only suitable company to develop the electronics XinRay needed.

37.     The technology that formed the basis of the electronic controls was rudimentary. Therefore, in fact, there were many companies that could have developed the electronic controls that Jafari claimed were exclusive to H&P.  Siemens was one such viable option.  So was Communications & Power Industries, the Canadian company that XinRay ultimately selected to replace H&P for a fraction of the cost.

38.     Jafari made material misrepresentations and omissions to induce XinRay into partnering with H&P, including deliberately concealing the fact that he was engaged in blatant self-dealing.  Among other things, Jafari never disclosed to XinRay that H&P was formed in January 2010, mere months before Jafari identified it as the sole viable contender.  Moreover, at the time that he pressured XinRay to contract with H&P—a deal pursuant to which XinRay paid substantial funds to H&P—Jafari did not inform XinRay's executives that he intended to become, and indeed became, a 50% owner of H&P a mere 11 days after XinRay contracted with H&P, and so he stood to personally benefit from the XinRay contract.  In deploying this scheme, Jafari partnered with Tran, the "P", in the H&P, who, on Jafari's instructions, signed the contract on H&P's behalf.

39.     Under Jafari's employment agreement with XinRay to develop electrical energy sources, all IP developed during his employment belonged to XinRay.  XinRay purchase orders that H&P agreed to as a condition for transacting with XinRay had similar language.  Throughout the course of his XinRay employment, and the course of H&P's work, Jafari represented to XinRay

on multiple occasions, in his position of trust and confidence, that H&P had delivered to XinRay all intellectual property that was required to be provided under XinRay purchase orders as well as under Jafari's employment agreement. H&P also transmitted inventory lists to XinRay, representing that the intellectual property specified on those lists had been delivered to XinRay. XinRay released milestone and final payments to H&P from 2010 through 2016 totaling over $1 million.

40.     In May 2016, Jafari resigned from XinRay to serve as Managing Director of H&P. This was around the time XinRay entered into a new joint venture which now operates under the name NuRay Technology Co. Ltd. ("NuRay"). Pursuant to its agreement with NuRay, XinRay was supposed to transfer its intellectual property to NuRay. Jafari—before leaving XinRay's employ—was in charge of gathering this data. Shortly before delivering the pertinent intellectual property to NuRay, XinRay discovered that relevant production documents, source codes, and layouts were missing. Jafari had taken them for himself.

41.     XinRay also discovered that prior to his departure from XinRay, Jafari had deleted his XinRay e-mail account to ensure that XinRay would not have access to documents and communications pertaining to the intellectual property he had stolen and was now withholding from XinRay. The deletion of the email account was done without XinRay's authorization, thereby intentionally causing damage to XinRay's computer and information systems, a criminal violation of the Computer Fraud and Abuse Act ("CFAA"), Title 18, United States Code, Section 1030(a)(5)(A).

42.     After learning of Jafari's theft, XinRay contacted Jafari and H&P on several occasions to request that they return XinRay's intellectual property. XinRay also repeatedly

notified Defendants Jafari and H&P that their continued failure and refusal to deliver XinRay's intellectual property would cause substantial financial injury to XinRay. Defendants admitted to possessing XinRay's intellectual property improperly, but they failed and refused to return it to XinRay.[4]

43.    Jafari would go on to use some of this misappropriated IP to induce Varex to enter into a joint venture with the purpose of misappropriating Varex intellectual property and trade secrets for his own benefit. The nanotube technology that Jafari stole took XinRay years to invent, develop and build. However, a mere five months after leaving XinRay, Jafari supposedly independently recreated all of the necessary technology to partner with Varex on nanotubes. This would be a virtually impossible task, unless Jafari used XinRay's IP as a foundation, or more likely, the entire basis of his new venture. Not only did Jafari's time at XinRay provide the technological foundation for H&P, it also provided the blueprint for how he would target his next mark: Varex.

**Negotiation and Formation of the VEC Joint Venture**

44.    As far back as 2016, months after leaving XinRay, Jafari set his sights on Varex. To that end, Jafari asked a mutual business contact for an introduction to Mr. Sunny Sanyal, Varex's CEO. Mr. Sanyal was thus introduced to Jafari on December 8, 2016. At the time of that introduction, Mr. Sanyal received a presentation created by Jafari involving Jafari's company,

---

[4]    H&P has claimed ownership of this intellectual property. However, a purchase order between XinRay and H&P contained terms and conditions which specified that if H&P believed it was the owner of any background intellectual property, H&P was required to identify and disclose to XinRay each and every item of background intellectual property owned by H&P before commencing the development of XinRay's electronic control systems. H&P never made any such disclosures.

H&P, which Jafari owns together with his co-conspirator Tran, and touting its work developing carbon nanotubes.

45.     In February of 2017, Varex and Jafari began discussing the possibility of partnering for the purposes of further developing nanotube technology for domestic and global commercial use in medical, industrial, and security applications.  That month, Jafari traveled to Salt Lake City, Utah in an effort to persuade Varex to partner with him and H&P.  Jafari would go on to visit Varex in Salt Lake City again in April and in October 2017, both times for the purpose of discussing the contemplated transaction.  In these visits, seeking to induce Varex to partner with him, Jafari touted H&P's development of nanotube-based materials for the purpose of being used as emitters in imaging machines.  H&P specifically emphasized the superiority of the materials used to create nanotube emitters making them more resilient to the harsh testing process that was needed to process x-ray tubes prior to distributing them to customers.

46.     Jafari, CETTEEN and H&P made numerous other false statements to induce Varex to enter into the joint venture.  For example, during the diligence discussions with Varex, Jafari stressed his knowledge of how to build carbon nanotube-based x-ray tubes—knowledge that he had illegally obtained from XinRay—stating that all he needed was for Varex to set up a manufacturing line to manufacture these tubes for him.  In these discussions, Jafari specifically requested that Varex refer to the technology as "nanotubes," rather than "carbon nanotubes."  Varex eventually came to realize that the purpose of this request was to obfuscate the origin of H&P's intellectual property, as Jafari was concerned that the use of the term "carbon nanotube" would permit XinRay to discover that Jafari had misappropriated XinRay's technology for himself.

47.     In fact, it was not possible for Jafari to have developed the relevant IP in the mere five months since he left XinRay.  Jafari's employment agreement with XinRay contained a non-compete clause that prevented Jafari from working for any competitors of XinRay for a period of two years after his employment was terminated.  Jafari left XinRay in May of 2016, and a mere six months later, his company, H&P—which had never previously developed carbon nanotubes—filed two relevant patents needed to build a carbon nanotube x-ray device.

48.     Jafari did not have the technical expertise to design and build nanotube-based emitters, so he and Tran conspired to poach other former XinRay employees to fill this scientific void at H&P and induced them to also breach their employment agreements with XinRay.  Then Jafari turned his sights to Varex and its intellectual property and trade secrets as a means to further his own ends.

49.     During the joint venture diligence process, Varex learned that Jafari controlled a complex web of numerous shell companies in Germany, including CETTEEN, H&P, and ESSPEN among others, each one nested within another like a set of Russian Matryoshka dolls.  When Varex's deal counsel inquired as to why this elaborate structure was necessary, Jafari simply cited tax reasons and gave no further explanation.  In reality, these entities allowed Jafari to move and hide assets, including intellectually property, to (among other things) shield himself from litigation risk.  There was no distinction in reality between Houman Jafari the individual, and his various entities which he used for the purposes of defrauding counterparties, including Varex.

50.     On August 30, 2017, while due diligence for the joint venture was in full swing, XinRay filed a complaint against Jafari and H&P in the United States District Court for the Eastern District of North Carolina, seeking, among other things, a declaratory judgment that certain

intellectual property in H&P's possession belonged to XinRay, and H&P's failure and refusal to deliver the intellectual property was unlawful. The complaint also alleged that Jafari breached his fiduciary duties and committed fraud against XinRay through his self-dealing transactions with H&P and his misappropriation of XinRay intellectual property for the benefit of himself and H&P. XinRay also alleged that Jafari violated Section 1030(a)(5)(A) of the CFAA by deleting his company email account without XinRay's authorization. On September 20, 2017, XinRay filed an amended complaint (the "<u>XinRay Suit</u>")[5], this time adding claims that Jafari misappropriated trade secrets under North Carolina law.

51.     Despite being in the middle of active deal diligence, Jafari did not disclose this lawsuit to his future business partners at Varex, notwithstanding the complaint's serious claims that cast a dark cloud over Jafari's and H&P's IP rights, including allegations of criminal conduct. Rather, a Varex IP attorney independently uncovered the suit as part of the diligence process.

52.     The resolution of this suit was a gating issue for Varex, as Varex never would have pursued the joint venture without ensuring that Jafari had full rights to all IP that he and his companies were promising as a key contribution to the joint venture.

53.     Once Varex learned of the lawsuit (despite Jafari's silence), it confronted Jafari and his counsel. On or about February 7, 2018, in response to queries from Varex regarding the XinRay Suit, Jafari misrepresented in an e-mail sent to Varex in the United States that he never signed or accepted an employment agreement with XinRay. Jafari's e-mail continued to materially deceive Varex into believing that he had legitimate rights in the intellectual property he was

---

[5]     *XinRay Sys., Inc. v. Houman Jafari & H&P Advanced Tech. GMBH*, No. 17-cv-00438-BR (E.D.N.C. Sept. 20, 2017), ECF No. 10.

promising to contribute to the joint venture—including specific misrepresentations that he never agreed to any confidentiality or IP assignment provisions with XinRay. In truth and in fact, on September 15, 2008, Jafari signed and accepted an employment agreement with XinRay that included confidentiality obligations ("You will be expected to maintain secrecy in respect of the affairs of the Company both during and after your employment"), as well as IP assignment language:

> During the term of your employment, any and all systems, works-in-progress, inventions, discoveries, improvements, processes, compounds, formulae, patents, copyrights and their continuations in part, made, discovered or developed by you, solely or jointly with others shall be fully disclosed by you to the management of the Company, and shall be the sole and absolute property of the Company, and the company will be the sole and absolute owner thereof to the extent of your interest herein.

54.    The XinRay suit was settled in March 2018, and Jafari and his attorney repeatedly asserted to Varex that Defendants owned the intellectual property that they were bringing to benefit the joint venture. Among other things, Jafari's attorney, copying Jafari, indicated in an email sent to the United States dated February 14, 2018, that "[t]he intellectual property H&P would provide to the joint venture is a completely different deign [sic] than what was developed for XinRay and was patented by H&P in 2017. XinRay makes no claims of ownership for these issued patents. H&P developed the concept for the intellectual property after the work for XinRay was completed."[6]

55.    The same email sought to deceive Varex into believing that there was no actual intellectual property dispute with XinRay, to further the false impression that H&P had legitimate

---

[6]    NuRay, the company that bought XinRay's IP, disagrees and has threatened to sue VEC based on Jafari's theft of XinRay's IP.

rights to the intellectual property that were critically being conveyed to the joint venture. Specifically, Jafari's attorney told Varex that "[f]rom H&P's perspective, there was never an intellectual property ownership dispute with XinRay. . . . H&P's refusal to resend the requested Development Intellectual Property to XinRay was solely based on export regulation requirements." In fact, the intellectual property that Jafari was promising to contribute to the joint venture with Varex was the intellectual property that he had stolen from XinRay.

56.     Based on these assurances, Varex continued to move forward with the transaction and the parties continued to negotiate the terms of the joint venture.

57.     On November 22, 2018, the JVA between Varex Germany and CETTEEN, Jafari, and H&P was executed.

**Key Provisions of the JVA**

58.     The joint venture established an operating company, VEC, as well as VEC's general partner, VEC Imaging Verwaltungsgesellschaft mbH ("VEC Germany").[7]

59.     The stated purpose of VEC was to develop, produce and sell x-ray imaging components and systems for medical, industrial and security application based on nanotube technology, as well as develop, produce and sell high voltage generators, control electronics and control software for conventional and nanotube-based x-ray tubes.

60.     The joint venture partners, Varex Germany and CETTEEN, were each to elect members to the Management Board, with two Managing Directors appointed by Varex Germany

---

[7]   With regards to the shareholder status of Varex Germany and CETTEEN in VEC, several proceedings are currently pending before the Regional Court of Nuremberg, including before the Chamber for Commercial Matters under case no. 2 HK O 4925/23.

and one Managing Director appointed by CETTEEN.  For its part, Varex Germany nominated Mr. Mark Jonaitis (who is employed by Varex U.S.) and Mr. Reinhard Leprich.[8]

61.     CETTEEN nominated Jafari as its Managing Director.  According to the VEC JVA, the CETTEEN Managing Director was given power to represent VEC individually, while Varex Managing Directors were only able to represent the company jointly with the CETTEEN Managing Director.[9]

62.     As is standard in joint venture agreements, the JVA requires the approval of both parties before VEC can enter into or terminate certain important contracts.  The purpose of these consent rights is to ensure that the views and concerns of both shareholders are respected, and in the VEC JVA operates as a check on the power given to the CETTEEN Managing Director to represent the joint venture individually.  This obligation to obtain both Varex's and CETTEEN's consent applies, among other things, to customer or supplier agreements with a total order value of more than €500,000.

63.     The JVA also requires the prior consent of the Managing Director appointed by CETTEEN and at least one Managing Director appointed by Varex for certain other business transactions including, among other things, the execution, amendment or termination of customer contracts or supplier contracts with an equivalent value of more than €100,000.

---

[8]   Due to the disputes between the parties and various spurious accusations by VEC and Jafari, Jonaitis and Leprich stepped down as Managing Directors of VEC on January 19, 2024.

[9]   Jafari resigned from his position as Managing Director of VEC Germany by letter dated February 12, 2024, effective on the date of entry in the commercial register.  The resignation of Jafari was entered in the German commercial register on March 8, 2024.  Phat Tran—the other 50% partner of H&P—was appointed by Jafari as the new CETTEEN Managing Director.

64.     VEC operates with a technical team in Erlangen, Germany, under the direction of Jafari.  The team in Erlangen was primarily responsible for the development of a carbon nanotube emitter.  It was tasked with providing 3D models or computer aided drawings of the emitter to the team in Salt Lake City, which in turn would develop a working x-ray tube.

65.     Prior to 2022, the team in Erlangen collaborated with another technical team in Salt Lake City, Utah, that worked on behalf of Varex Germany under the direction of Varex U.S. employees.  The Salt Lake City team essentially consisted of Varex U.S. employees whose capacities Varex made available to VEC.  Varex did so to comply with the JVA, which required Varex Germany to contribute the equivalent of four full-time employees for a period of three years to support development of the tubes.  The individuals continued to be employed and remunerated by Varex U.S.

66.     Varex U.S. continued to assign employees to duties in support of VEC for more than nine months after the expiry of Varex Germany's three-year contractual obligation in the JVA.  Varex bore all associated costs of these employees during this nine-month extended period even though, under the JVA, it was VEC's obligation to pay all costs after the three-year period had concluded.

67.     In addition to providing full time equivalents to the joint venture, Varex was contractually committed to providing substantial funding, as well as manufacturing working prototypes.  Varex was required to contribute €1 million at closing, and up to an additional €3 million, contingent on certain enumerated events.  Varex was also required to manufacture five working prototypes of nanotube-based x-ray tubes, provided that the joint venture covered the cost of raw materials and as otherwise set forth under relevant agreements and specifications.

68.     In exchange for the various contributions made by Varex to VEC—including contributing millions of euros in funding, full time equivalents, and building prototypes— CETTEEN and H&P made a number of commitments to Plaintiffs that were material to Varex agreeing to have Varex Germany enter into the joint venture, including promises to provide critical assets, such as intellectual property, as discussed below.

69.     Jafari, CETTEEN and H&P further promised in the JVA that CETTEEN and H&P would transfer certain other assets to the joint venture.   This included current customer relationships, customer data related to the joint venture, and data files reflecting intellectual property which CETTEEN and H&P claimed to own outright, and which was required to support the development and manufacturing processes for the nanotubes.   The additional assets that CETTEEN and H&P promised to contribute were reflected in an "Asset Transfer Agreement" that was negotiated contemporaneously with the JVA and executed shortly thereafter, on December 12, 2018.  The contribution of those assets was a material part of the arrangement to Varex.

70.     There is no evidence that CETTEEN and H&P have ever transferred any of these other assets to VEC—and they have therefore failed to transfer all assets necessary or useful to VEC's business that are owned by, licensed to, or used by CETTEEN, H&P, Jafari or any person or entity associated with any of them.  In fact, Jafari never intended to transfer these assets.

71.     Further, under the Asset Transfer Agreement, CETTEEN and H&P were supposed to transfer certain contracts to VEC.  CETTEEN and H&P never did so but claimed that they did. For example, Jafari was supposed to transfer an agreement between Varex and H&P related to the development of pulse modulators to VEC.  Jafari claimed numerous times that the contract was transferred.  When pressed for proof, Jafari then said that the document was being prepared by his

attorney.  Jafari never sent over proof of the transfer and as recently as May 2024, H&P stated that the pulse modulator project was never transferred to VEC.  In fact, Jafari never intended to transfer these contracts.

**Intellectual Property in the Joint Venture**

72.      As part of the JVA, Varex Germany, CETTEEN and H&P also entered into an "<u>IP Agreement</u>."  The IP Agreement relates to categories of IP they each brought to the joint venture and ownership and maintenance of certain assets during and after the JV.

73.      Nonetheless, issues proliferated regarding the inventorship of certain IP.  Jafari asked Varex if its lawyers could help with registering CETTEEN's patents with the World Intellectual Property Organization ("<u>WIPO</u>").  Varex agreed to have its IP lawyers perform work for VEC and agreed to reimburse Varex for filing fees and associated costs, for which VEC was later invoiced.  Those invoices remain unpaid.

74.      In attempting to complete the requisite registration paperwork, Varex discovered that several patents owned by CETTEEN and pledged to the joint venture contained incorrect inventorship information.  Inventorship is distinct from ownership of a patent.  Incorrect inventorship on these patents had the potential to jeopardize their validity and, in turn, significantly decrease the current and future value of the joint venture.  An individual listed as an inventor on one of the CETTEEN patents filed in the EU was in fact only a patent agent who was paid to be named as an inventor— and who then immediately transferred his ownership to Jafari.  As Jafari explained it to Varex's IP counsel, "[a]t the time we filed the provisional patent Mr. Weber was working for [my Patent attorney]! With [Jafari's patent attorney's] permission we put Mr. Weber [sic] name on the patent to protect us further! So Mr. Weber is not the inventor! For this purpose

we paid him and he transferred all rights completely back to us!" Jafari then unilaterally attached a substitute statement to this email on behalf of CETTEEN certifying to the USPTO that this mysterious Mr. Weber could not be found. And he never was. At least, not by Varex for the purposes of correcting the patent in question.

75.     This issue was discovered by Varex more than a year after VEC was formed—rather than having been disclosed voluntarily to Varex by Jafari or anyone else at CETTEEN. The confusion surrounding the inventorship of these particular patents meant that Varex did not have documentation or proof that CETTEEN had the rights to this patent that it had pledged to the joint venture under the IP Agreement.

76.     When Varex sent Jafari power of attorney forms in aid of making the necessary corrections to the CETTEEN patent inventorship, Jafari attempted to sign these forms on behalf of Herbert Schmalfuβ, who Jafari claimed was the CEO of CETTEEN at the time. Jafari never bothered to consult with Varex before altering the form he received from Varex so as to remove his own name and replace it with that of Mr. Schmalfuβ. Jafari could have signed them in his own capacity as a Director of CETTEEN but it appears that he did not want to attach his own name to these documents.

77.     As noted, this process to correct the inventorship of some of the patents that were to be assigned or licensed to the joint venture was fraught with chaos and confusion. But in the midst of all of this, Jafari made sure to use this opportunity to insist that he be added as an inventor to those patents. There is, however, no evidence that Varex has seen to support Jafari's claim of having "invented" these inventions; only his attempt to grab the technology for himself.

78.     Varex would later discover that Jafari made a habit of conflating assets under his control, seamlessly shifting them from one of his entities and/or close associates to another when it suited him to do so and treating them as fungible.

79.     For instance, Jafari conspired with his wife, Dr. Zahra Mohammadi, who is not an engineer but a chiropractor, to name Mohammadi as the sole inventor of five U.S. patents relating to nanotube technology.  Accepting Jafari's instruction, Mohammadi agreed to identify herself as an inventor of inventions she did not invent.

80.     These patents had been assigned to both Defendant ESSPEN and a company called Dennec Systems, GmbH (yet another entity controlled by Jafari).  Upon learning in 2020 that Jafari's wife had been credited as the inventor, Varex began to wonder if "the ESSPEN patents were listed in his wife's name to protect them from his lawsuits and creditors attempting to get them as payment. . . ."

81.     During the course of the joint venture, Varex also learned that Jafari was misusing IP that belonged to his former employer, Siemens.  Indeed, at various points in time during the course of the joint venture, when discussing optimal nanotube design with Varex employees, Jafari shared slides which contained the logo of his former employer, Siemens, depicting an x-ray tube design that clearly did not belong to him.  While claiming to have designed this tube, Jafari would wink and say, in sum or substance, "you never saw this."  Yet, in each of these conversations, Jafari would stress that the tube depicted in the Siemens slide was the ideal design that Varex should aim to replicate in its work with VEC.  Jafari would show a copy of the slides with Siemens' logo on them in meetings, but once the conversation moved to the next topic, he would hastily hide it away again so that there would be no hard proof of his theft or deceit.

**NuRay Cease and Desist Letter**

82.     On May 14, 2021, NuRay, the company that had acquired XinRay's assets as part of that joint venture agreement, sent Varex and VEC a cease-and-desist letter directed towards VEC, alleging that VEC was infringing on NuRay's intellectual property and trade secrets.  NuRay alleged that the infringement was apparent based on the similar nature of the products made by VEC and NuRay, and the fact that Jafari was previously employed by XinRay and was directly involved in the transfer of assets from XinRay to NuRay.

**Disputes Over Patents 4, 5 and 6**

83.     In December 2021, Varex and VEC were faced with yet another issue over patent ownership—this time involving the ownership of three patents informally referred to as patents 4, 5, and 6, all of which were developed by employees of Varex U.S. and/or VEC after the JVA and IP Agreement were signed.

84.     Patent 4 was initially filed with the USPTO on July 2, 2020.  The application named 5 inventors: Houman Jafari, Bo Gao and Mohamed Zaza of VEC, and Vance Robinson and Colton Woodman of Varex U.S.  In that same application, the patent was assigned to VEC.

85.     Patent 5 was initially provisionally filed with the USPTO on December 31, 2020. The application named three inventors: Houman Jafari and Bo Gao of VEC, and Vance Robinson of Varex U.S. In that same application, the patent was assigned to VEC.

86.     Patent 6 was initially provisionally filed with the USPTO on December 31, 2020. The application named two inventors: Dave Kirkham and Vance Scott Robinson, both Varex U.S. employees.  Varex U.S. was named as the applicant.

87.     By the end of 2021, Varex's technical team began to get the impression that Jafari intended to use the technical developments created by Varex's fee earners exclusively for his own purposes rather than in the interests of VEC and the JVA.  Indeed, Defendants appeared to be trying to divert new developments and resulting business opportunities to Jafari and the companies he controlled, including CETTEEN, H&P and ESSPEN.  At the same time, VEC began to face multiple liquidity crises.

88.     These factors spurred Varex to take steps to solidify its ownership interest in patents 4, 5, and 6, since Varex U.S. employees had collaborated with VEC employees on inventing patents 4 and 5 and were solely responsible for the invention of patent 6.  Furthermore, full time employees of Varex U.S. sign an agreement as a condition of their employment assigning Varex U.S. exclusive property rights to any and all intellectual property conceived, made, developed, authored or first reduced to practice by the employee, including inventions made in whole or in part solely or jointly with others.

89.     On December 30, 2021, Varex U.S. and VEC signed a letter agreement stating that although the ownership of some of the patents was disputed, the parties agreed that VEC and Varex U.S. would have joint ownership of some of them so that the parties could file these patents with the relevant international patent authorities before the right to do so expired at year-end.  However, in this same agreement, the parties further acknowledged that this was a temporary solution, rather than any sort of acknowledgement of correct ownership.[10]

---

[10]   On August 30, 2024, Varex filed a declaratory judgment action in the District Court for the Eastern District of Virginia asking the court to find that (i) the inventors listed on the face of patents 4 and 6 are correct and (ii) the current assignment records at the USPTO, which state that patent 4 is jointly owned by Varex and VEC, and patent 6 is solely owned by Varex, reflect

**VEC Agreement with Siemens**

90.     By 2022, Jafari's efforts to enrich himself at Varex's expense expanded beyond just the cryptic and underhanded way in which Jafari handled these patent applications and assignments.

91.     In or about July 2022, Varex learned that, for months, Jafari had been secretly negotiating with Siemens Healthcare GmbH ("Siemens Healthcare")[11] concerning a Feasibility Study Agreement ("FSA"). In the proposed transaction, VEC, working with ESSPEN, would deliver to Siemens Healthcare a full CT system utilizing, *inter alia*, VEC's intellectual property and technology. But, under the documents that Jafari prepared, he would be able to allocate proceeds to ESSPEN as he saw fit. Nothing limited the percentage (including up to 100%) that could be allocated to ESSPEN, or required ESSPEN to share any funds with VEC (and, therefore, with Varex). While Jafari worked on the FSA for months, he did not inform Varex, or either of Varex's appointed Managing Directors about this contemplated collaboration, despite the fact that he had an obligation to do so under the JVA based on the size of the agreement. By the time Varex learned of these negotiations, it was told that Siemens Healthcare had already given preliminary approval for the FSA.

92.     In persuading Siemens Healthcare to approve the FSA, Jafari again needed the help of his wife and co-conspirator Zahra Mohammadi. Thus, in the draft FSA, Jafari also designated his chiropractor wife, Zahra Mohammadi to be a Project Manager and sole contact person for Siemens Healthcare at ESSPEN (and, acting in response to Jafari's instruction, Mohammadi

---

the proper ownership of those patents. *See Varex Imaging Corp. v. VEC Imaging GmbH & Co. KG*, Docket No. 1:24-cv-01525 (E.D. Va. Aug. 30, 2024).

[11]     In 2017, Siemens Healthcare was spun off from Siemens, becoming a separate enterprise.

agreed to be so identified).  Again, Mohammadi is not a scientist.  She is not an engineer.  She is not an employee of VEC.  She has no observable skills, training, or education that would allow her to contribute to the development of the carbon nanotube—a cutting edge scientific invention requiring deep knowledge of physics.  She is, however, Jafari's wife, rendering her someone that he can trust and control.  Neither Jafari nor Mohammadi informed Siemens Healthcare about Mohammadi's lack of qualifications.

93.     The draft contract also included provisions that purportedly obligated Varex U.S. to perform services under the FSA—even though Varex was not included as a party to the agreement and had played no role (and had not even been aware of) negotiation of the agreement. And Varex was provided no right to or interest in any of the IP created under the FSA, nor would it receive compensation under the FSA.

94.     Upon discovering that Jafari was negotiating the FSA and doing so in secret in violation of his obligations under the JVA, Varex communicated concerns about these provisions to Jafari on several occasions.  At the beginning of September 2022, Varex proposed entering into supplemental agreements before the FSA was executed that would have allayed its concerns.  Jafari pretended to heed Varex's concerns, while secretly continuing to negotiate with Siemens Healthcare.  Ignoring Varex's concerns—and acting in violation of Varex's consent rights in the JVA—Jafari eventually informed Varex in an email sent on September 28, 2022 that, in fact, he had already signed the FSA on VEC's behalf.  Not only had he executed the FSA on VEC's behalf, but he had done so *months earlier*—in early August 2022—and had kept that secret from Varex for several weeks.  In doing so, Jafari violated the plain terms of the JVA by failing to obtain

approval of the Varex Managing Directors.  He did so in order to secure terms that benefitted him and the companies he controlled, while damaging Varex (and further crippling VEC).

95.     In negotiating and signing the FSA, Jafari was doing what had now become a pattern: stealing the technology, inventions, and intellectual property of others—this time VEC and Varex—to enrich himself.  Thus, notwithstanding that VEC was expected to contribute to the FSA and Varex was supposed to provide services in furtherance of the FSA, it was Jafari, the beneficial owner of ESSPEN, who would unilaterally determine the share of proceeds that would be sent to ESSPEN—wholly stripping VEC of the benefit of those assets.

**Varex Learns that VEC is Stealing and Distributing Varex's Proprietary Information**

96.     In June 2023, Varex realized that Jafari was not only violating the JVA in pursuit of customer agreements that usurped opportunities from Varex (and VEC), but he was also stealing proprietary information from Varex and using it to benefit himself—while also damaging Varex's customer relationships.

97.     For example, in December 2019, VEC had entered into a development agreement with Smiths Heimann GmbH ("Smiths") (the "Smiths Development Agreement").  Smiths is a manufacturer of detection and screening technology for the aviation, ports and borders, urban security, and defense end use markets, and is an important customer of not only VEC, but also Varex, and has been for many years.  Under the Smiths Development Agreement, VEC was to design and manufacture five prototypes for x-ray tubes for Smiths.  The aim was the joint development, by Smiths and VEC, of a marketable product.  To comply with its obligation to Smiths, VEC would order prototypes from Varex, whereby VEC would bear raw material costs

for the manufacture of the prototypes.  The production of the prototypes took place in Varex U.S.'s Salt Lake City facilities.

98.     To aid in the due diligence process for the Smiths Development Agreement, Varex U.S., VEC, and Smiths entered into a three-way non-disclosure agreement dated May 1, 2019 (the "Smiths NDA") to allow for the exchange of confidential information during the negotiation process, as well as once the final Smiths Development Agreement was executed.

99.     In June 2023, several years after the Smiths agreements (including the NDA) were signed, Varex was contacted by Wesgo Ceramics GmbH ("Wesgo").  Wesgo was and remains one of Varex's long-time third-party suppliers.  Specifically, for several years, Wesgo has supplied Varex with certain ceramic components which Varex uses in its x-ray tubes.

100.    In 2023, Wesgo informed Varex that it had been contacted by VEC, acting on Jafari's instructions, asking Wesgo to supply those same ceramic components directly to VEC.  As part of VEC's outreach to Wesgo, VEC had provided Wesgo with drawings of an x-ray tube component that Wesgo immediately recognized as originating from Varex.  In fact, a representative of Wesgo described the drawings he received from VEC as "1:1 translations of the original Varex drawings."  Varex promptly informed Wesgo that the drawings were not VEC drawings but instead an unauthorized copy of Varex drawings.

101.    Based on the drawings Wesgo received from VEC, Varex realized that the misappropriated drawings had been communicated by Varex to VEC in connection with the Smiths Development Agreement.  This was intellectual property that Varex had shared pursuant to the terms of the Smiths NDA, and which was not allowed to be shared with any third parties—which included Wesgo.  The disclosure to Wesgo violated the Smiths NDA, as would have any work

done by VEC to reverse engineer Varex's intellectual property, including the drawings that were now in the possession of Wesgo.

102.    All Varex prints of sensitive trade secret information include an explicit confidentiality notice.  Furthermore, within Varex, these prints are protected by various technical and organizational measures to protect their confidentiality.

**Jafari provokes the termination of the Smiths Agreement and blames Varex**

103.    As Varex tried desperately to protect its financial interests in the VEC joint venture as well as its intellectual property rights—which seemed increasingly to be at risk of being misappropriated by Jafari and his companies—Jafari continued to take steps to harm Varex, its business, and its reputation in the nanotube and x-ray industries.  This was all in furtherance of Jafari's scheme to steal Varex's IP and increase his own standing in the industry, at the expense of his business partners and others.

104.    Under the Smiths Agreement, VEC was supposed to design and develop a multibeam x-ray tube for use in Smiths' x-ray scanners.  However, only one prototype of the five due under that agreement (*see supra* ¶ 97) had been delivered.  Others were repeatedly delayed because VEC did not deliver the components it was required to supply for the manufacture of the prototypes or was late in doing so.  VEC was also late in granting the necessary design approvals Varex needed.

105.    In addition, VEC did not fulfill its obligation to pay for the costs of material that had been incurred by Varex in building the prototypes.  VEC, to this day, has not paid any of these invoices.  (Defendants have been unjustly enriched by these and other sums, all detailed *infra* at ¶¶ 183-193 and incorporated herein by reference.)

106.   Jafari also caused VEC to send purchase orders for material with erroneous prices—for example, quoting $28,600 instead of $8,400 for certain items—which required Varex to reject the purchase orders until they could be corrected, and further delaying the schedule.

107.   In December 2023, Smiths terminated the development contract.  It is clear from Smiths' termination letter that the termination was provoked by a November 7, 2023 email sent to Smiths by Mr. Jens Peter Wartmann—VEC's CFO.  In that email, the relevant content of which was reproduced verbatim in Smiths' termination letter, Wartmann placed all blame for any delays on Varex.  And he further tarnished Varex's reputation and damaged its business by expressing the fear that Varex would not be able to supply high-quality x-ray tubes in the future either.

\*       \*       \*

108.   Realizing that his scheme to fleece Varex went as far as it could, Jafari decided to terminate the VEC joint venture in the summer of 2024.   To do so, however, he needed an entity to take over VEC's assets.   On August 9, 2024, Jafari created H&S, with himself as the sole shareholder.   H&S's stated purpose is to hold Jafari's assets.  A few weeks later, Jafari purported to terminate the VEC joint venture, sending Varex Germany a notice of termination, which Tran signed as the Managing Director of CETTEEN.  Two days later, VEC's website went dark.  Since then, Varex has not been able to account for VEC's assets.

109.   Jafari's years'-long scheme to steal intellectual property and other assets from his business partners, employees and others has caused significant harm to Varex.  Varex now seeks to hold Jafari responsible, along with his alter ego companies—CETTEEN, H&P, ESSPEN, and H&S—and to be awarded appropriate relief.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violations of the Racketeer Influenced and Corrupt Organizations Act,
### 18 U.S.C. §§ 1962(d) (against all Defendants)

110.   The allegations in paragraphs 1 through 109 of the Complaint are repeated and re-alleged as though fully set forth herein.

111.   At all relevant times, Varex was a person within the meaning of 18 U.S.C. § 1961(3).

112.   At all relevant times, Varex was a "person injured in his or her business or property by reason of a violation of" RICO within the meaning of 18 U.S.C. § 1964(c).

113.   At all relevant times, each Defendant was a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### *The RICO Enterprise*

114.   Defendants along with Tran, Mohammadi, and Wartmann are a group of persons associated together in fact for the common purpose of improperly obtaining intellectual property from competitors to pass it off as their own, to the detriment of those competitors, in an effort to become leaders in, and generate profits from emerging carbon nanotube technology.  *See supra* ¶¶ 32-103.

115.   Defendants controlled and used a complex web of multiple corporate entities to carry out their fraudulent scheme, including CETTEEN, H&P, ESSPEN, and H&S.  All of these entities were under the control of Houman Jafari.

***Pattern of Racketeering Activity***

116.    At all relevant times, Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of engaging in a scheme to engage in business relationships with the intent of stealing their partner's intellectual property through an unlawful pattern of racketeering activity involving, theft of trade secrets (18 U.S.C. § 1832), criminal copyright (17 U.S.C. § 506(a)(1)), and wire fraud predicate offenses (18 U.S.C. § 1343) within the meaning of 18 U.S.C. § 1961(5), and in violation of 18 U.S.C. § 1962(c), with such conduct and activities affecting interstate and foreign commerce.

117.    Since at least 2018, Defendants have committed numerous related acts of theft of trade secrets and wire fraud to improperly gain access to and control of Varex's intellectual property.

118.    Varex's injuries are a direct, proximate, and reasonably foreseeable result of these violations, and Varex will continue to be harmed by Defendants' ongoing conduct and continued violations.

119.    Varex is entitled to recover treble damages plus costs and attorneys' fees from Defendants in accordance with 18 U.S.C. § 1964(c).

***Theft of Trade Secrets Predicate Offenses***

120.    Defendants committed theft of trade secrets for their own economic benefit and to the detriment of the rightful owner of the information, in violation of Title 18, United States Code Section 1832.

121.    For instance, Jafari diverted XinRay's intellectual property to his company H&P, where he installed Tran as a frontman, and intentionally caused unauthorized damage to XinRay's

computer systems, including by erasing his emails, in an effort to conceal his actions.  This theft was to the economic detriment of XinRay, the rightful owner of that property, and NuRay, who lawfully had obtained ownership from XinRay.

122.    Furthermore, during the course of his work with VEC, on several occasions, Jafari displayed to several Varex employees a slide depicting the trade secrets of his former employer, Siemens, to that company's detriment.  The slide depicted a tube design that clearly did not belong to Jafari.  When displaying the slide, Jafari would wink and nod and say, in sum or substance, "you never saw this," yet he indicated to Varex that he wanted Varex to replicate the tube design shown in the Siemens slide in its work with VEC.  Jafari would show a copy of this slide in meetings, but once the conversation moved to the next topic, he would hastily hide it away again so that there would be no proof of his actions.

123.    Jafari then turned this strategy onto to Varex, using VEC to extract prints (or the knowledge to reverse engineer the prints) containing trade secrets from Varex that VEC then distributed to third-party Wesgo without the knowledge or consent of Varex, and in violation of the Smiths NDA.

124.    Varex has suffered injury to its business as a result of these fraudulent schemes.

### *Criminal Copyright Offenses*

125.    The allegations in paragraphs 120 through 124 show that Defendants also committed criminal copyright infringement for the purposes of commercial advantage and private financial gain, in violation of Title 18, United States Code, Section 2319.

126.    Varex has suffered injury to its business as a result of these fraudulent schemes.

*Wire Fraud Predicate Offenses*

127.    Defendants committed wire fraud with the intent to defraud and obtain intellectual property by means of false or fraudulent pretenses.  Defendants transmitted or caused to be transmitted writings, signs, and signals via wire communication in interstate or foreign commerce for the purpose of executing fraudulent schemes, in violation of Title 18, United States Code, Section 1343.

128.    For instance, in March 2018, when the XinRay Suit was settled, Jafari made material representations to Varex in emails that were sent to Varex in Utah in February 2018 that the suit had no merit and that he rightfully owned all of the IP he and his companies were bringing to the JV.  The 2021 cease-and-desist letter from NuRay, XinRay's successor, demonstrates that this was not the case.

129.    Furthermore, Jafari also made a material omission by not informing and seeking the approval of the Varex Managing Directors of the FSA with Siemens Healthcare transaction, as required to under the plain terms of the JVA.  In an email dated September 28, 2022, Jafari revealed to Varex that he had signed the FSA on behalf of VEC back in August of that year.  In doing so, Jafari secured favorable terms that allowed him sole discretion to divert the proceeds of the transaction to his company ESSPEN.

130.    Additionally, from the time the JVA closed and continuing until the present day, CETTEEN and H&P never transferred the trade secrets and other intellectual property that it committed to VEC despite being contractually obligated to do so under the JVA.  Nor did CETTEEN or H&P ever have any intention of doing so, yet Jafari represented that they would in order to obtain property in the form of access to Varex IP and profits from the joint venture.  These

representations, which were made using wire communications and received by Varex in Utah, were material to Varex, which then caused its subsidiary Varex Germany to enter into the JVA.

131.    Varex has suffered injury to its business as a result of these fraudulent schemes.

### *Conspiracy to Violate RICO*

132.    Defendants have undertaken the fraudulent acts described above as part of a common scheme.  Defendants willfully, knowingly, and unlawfully conspired and agreed to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).  *See supra* ¶¶ 1-109.

133.    Defendants knew that they were engaged in a conspiracy to commit multiple wire fraud and trade secrets predicate offenses, and they knew that their predicate acts of theft of trade secrets and wire fraud were committed as part of such racketeering activity.  Their agreement to directly or indirectly participate in the conduct, management, or operation of the scheme was necessary in order to commit this pattern of racketeering activity.

134.    Varex has suffered injury to its business as a result of these actions.

### SECOND CAUSE OF ACTION
### Fraudulent Inducement (against Jafari, CETTEEN, H&P)

135.    The allegations in paragraphs 1 through 134 of the Complaint are repeated and re-alleged as though fully set forth herein.

136.    During the course of negotiating the VEC joint venture agreement, Jafari and CETTEEN knowingly made numerous misrepresentations of material fact for the purpose of inducing Varex to enter into the JVA.

137.    At all times, Varex—acting reasonably and in ignorance of the falsity of those statements—relied on Defendants' misrepresentations to its detriment.

138.    For example, in order to assuage concerns raised by Varex about IP ownership allegations in the XinRay Suit, Jafari caused his attorney to represent to Varex that the XinRay litigation was never about IP, but rather was a dispute about export control licenses.

139.    Jafari and CETTEEN also claimed that they intended to transfer specified IP to the joint venture; however; CETTEEN, H&P and Jafari failed to transfer all necessary and useful assets to VEC despite contracting to do so as a critical part of the joint venture and  never intended to do so.

140.    Furthermore, Jafari and CETTEEN represented that they owned all the IP they intended to transfer to the joint venture.  Varex relied on CETTEEN's representations in the IP Agreement executed in conjunction with the JVA that CETTEEN owned and had the right to use all the IP it was assigning to the joint venture.  In fact, Defendants do not rightfully own all of the IP they promised to transfer to the joint venture.

141.    In addition, throughout negotiation of the JVA, Jafari, on behalf of himself, CETTEEN and H&P, stated that their goal was to enter into the joint venture for the purpose of developing nanotube technology.  Unknown to Plaintiffs, Defendants' true goal was not to develop nanotube technology, but rather to steal Plaintiffs' intellectual property.

142.     Varex negotiated the joint venture agreement in good faith, and reasonably assumed that Defendants were doing the same.

143.    Varex conducted appropriate due diligence and inquired further of Defendants when questions arose.

144.    Varex reasonably relied on the answers provided by Defendants to those questions.

145.    Jafari, CETTEEN and H&P made the representations identified above and others either (a) knowing they were false or (b) recklessly, knowing that there was insufficient knowledge upon which to base such a representation.

146.    Varex has suffered significant damages as a result, including by losing its investment in the joint venture, failing to be paid on loans and raw materials provided to the joint venture, losing the time and effort of its employees whose work was dedicated to the joint venture, and losing the value of the time, labor and materials associated with prototypes manufactured by Varex for VEC.

**THIRD CAUSE OF ACTION**
**Trade Secret Misappropriation (18 U.S.C. § 1836) (against Jafari, CETTEEN)**

147.    The allegations in paragraphs 1 through 146 of the Complaint are repeated and re-alleged as though fully set forth herein.

148.    In connection with Varex's business, including designing and manufacturing x-ray tubes for medical and security related applications that are used, sold, shipped, and/or ordered in, or intended to be used, sold, shipped, and/or ordered in interstate or foreign commerce within the meaning of Section 1836(b)(1).

149.    Varex develops and owns a significant amount of intellectual property and trade secrets, including drawings of its proprietary designs.

150.    Varex's intellectual property and trade secrets are protectable trade secrets under the DTSA, 18 U.S.C. § 1836.   Considerable time and resources were expended developing, refining, and/or compiling its intellectual property and trade secrets.

151.    Varex relies on its proprietary technology and intellectual property—including drawings and renderings of its designs—as the basis for the products it develops, markets, manufactures and sells.

152.    Varex takes reasonable steps to keep its trade secrets confidential.  This includes limiting who can see it and having physical security at its offices, including locked doors, access logs and restricted access to sensitive files.  In addition, all Varex prints of sensitive trade secret information include an explicit confidentiality notice.  Furthermore, within Varex, these prints are protected by various technical and organizational measures to protect their confidentiality.

153.    Varex also protects its intellectual property, trade secrets, and proprietary technology and designs through non-disclosure agreements which prohibit the misuse or further dissemination of confidential information which is disclosed to others in the course of development projects and other work.

154.    In connection with work performed for Smiths under the Smiths Development Agreement, VEC, Smiths and Varex U.S. executed a non-disclosure agreement to protect trade secrets and confidential and proprietary information disclosed in connection with work under (and in the diligence period leading up to) that agreement.

155.    In connection with work performed under the Smiths Development Agreement, and pursuant to the terms of the Smiths NDA, VEC, which included Jafari as its Managing Director, acquired Varex IP by improper means by inducing Varex to share its proprietary and confidential information through misrepresentations that he and VEC would maintain the confidentiality of Varex IP and that Varex IP would be used for the benefit of the JVA instead of for Jafari's own personal benefit.

156.    In connection with work performed under the Smiths Development Agreement, and pursuant to the terms of the Smiths NDA, Varex shared proprietary and confidential information with VEC, which included Jafari.  Jafari had a duty to maintain the confidentiality of Varex IP pursuant to the Smiths NDA.

157.    Varex IP is not generally known or ascertainable to others outside of Varex, except to persons or entities to which Varex has disclosed it under strict confidentiality obligations, and such information derives significant economic value from its secrecy.  Without Varex IP, it would take a competitor a considerable amount of time, effort, expense, and expertise to duplicate the Varex IP, and it is unlikely that the Varex IP could be duplicated at all without access to them.

158.    Jafari, despite his duty to maintain the confidentiality of Varex IP, knowingly and willfully misappropriated the Varex IP shared under and pursuant to the terms of the Smiths NDA, and shared Varex designs, or designs based on Varex IP that had been reverse-engineered, with third-party supplier Wesgo.

159.    Wesgo was not a party to the Smiths NDA.

160.    Wesgo was not involved in any work performed for Smiths in connection with the Smiths Development Agreement.

161.    Varex did not provide permission for the drawings and IP shared with Jafari and VEC under the Smiths NDA, or otherwise, to be sent to or disclosed to Wesgo.

162.    Defendants' theft and misappropriation of Varex's trade secrets was conducted in a willful and malicious manner and for an improper purpose.

163.    Defendants' theft and misappropriation of Varex's trade secrets has directly and proximately caused damages to Varex and its business, and Varex is entitled to actual damages in an amount to be proven at trial.

164.    Because Defendants' misappropriation of Varex's trade secrets has been conducted in a willful and malicious manner, Varex also is entitled to exemplary damages under 18 U.S.C. § 1836 (b)(3)(C) in an amount not exceeding two times the award of damages as well as its attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

**FOURTH CAUSE OF ACTION**
**Trade Secret Misappropriation (Utah Code Ann. § 13-24-1) (against Jafari, CETTEEN)**

165.    The allegations in paragraphs 1 through 164 of the Complaint are repeated and re-alleged as though fully set forth herein.

166.    In connection with Varex's business, including designing and manufacturing x-ray tubes for medical and security related applications, Varex develops and owns a significant amount of intellectual property and trade secrets, including drawings of its proprietary designs.

167.    Varex's intellectual property and trade secrets are protectable trade secrets under Utah's Uniform Trade Secrets Act ("UTSA"), Utah Code § 13-24-1 *et seq*.  Considerable time and resources were expended developing, refining, and/or compiling its intellectual property and trade secrets.

168.    Varex relies on its proprietary technology and intellectual property—including drawings and renderings of its designs—as the basis for the products it develops, markets, manufactures and sells.

169.    Varex takes reasonable steps to keep its trade secrets confidential.  This includes limiting who can see it and having physical security at its offices, including locked doors, access

logs and restricted access to sensitive files.  In addition, all Varex prints of sensitive trade secret information include an explicit confidentiality notice.  Furthermore, within Varex, these prints are protected by various technical and organizational measures to protect their confidentiality.

170.    Varex also protects its intellectual property, trade secrets, and proprietary technology and designs through non-disclosure agreements which prohibit the misuse or further dissemination of confidential information which is disclosed to others in the course of development projects and other work.

171.    In connection with work performed for Smiths under the Smiths Development Agreement, VEC, Smiths and Varex executed a non-disclosure agreement to protect trade secrets and confidential and proprietary information disclosed in connection with work under (and in the diligence period leading up to) that agreement.

172.    In connection with work performed under the Smiths Development Agreement, and pursuant to the terms of the Smiths NDA, VEC, which included Jafari as its Managing Director, acquired Varex IP by improper means by inducing Varex to share its proprietary and confidential information through misrepresentations that he and VEC would maintain the confidentiality of Varex IP and that Varex IP would be used for the benefit of the JVA instead of for Jafari's own personal benefit.

173.    In connection with work performed under the Smiths Development Agreement, and pursuant to the terms of the Smiths NDA, Varex shared proprietary and confidential information with VEC, which included Jafari as its Managing Director.  Jafari therefore acquired a duty to maintain the confidentiality of Varex IP pursuant to the Smiths NDA.

174.    Varex IP is not generally known or ascertainable to others outside of Varex, except to persons or entities to which Varex has disclosed it under strict confidentiality obligations, and such information derives significant economic value from its secrecy.  Without Varex IP, it would take a competitor a considerable amount of time, effort, expense, and expertise to duplicate the Varex IP, and it is unlikely that the Varex IP could be duplicated at all without access to them.

175.    Jafari, despite his duty to maintain the confidentiality of Varex IP, knowingly and willfully misappropriated the Varex IP shared under and pursuant to the terms of the Smiths NDA, and shared Varex designs, or designs based on Varex IP that had been reverse-engineered, with third-party supplier Wesgo.

176.    Wesgo was not a party to the Smiths NDA.

177.    Wesgo was not involved in any work performed for Smiths in connection with the Smiths Development Agreement.

178.    Varex did not provide permission for the drawings and IP shared with Jafari and VEC under the Smiths NDA, or otherwise, to be sent to or disclosed to Wesgo.

179.    For all the same reasons as set forth above in relation to the Third Cause of Action, Defendants have misappropriated Varex's trade secrets under Utah state law.

180.    Defendants' misappropriation of Varex's trade secrets has directly and proximately caused damages to Varex and its business.  Varex is therefore entitled to an award of actual damages in an amount to be proven at trial.

181.    Because Defendants' misappropriation of Varex's trade secrets has been conducted in a willful and malicious manner, Varex also is entitled to exemplary damages under Utah Code

Ann. § 13-24-4(2) in an amount not exceeding twice the award of damages, as well as its attorneys' fees under Utah Code Ann. § 13-24-5.

## FIFTH CAUSE OF ACTION
### Unjust Enrichment (against Jafari)

182.    The allegations in paragraphs 1 through 181 of the Complaint are repeated and re-alleged as though fully set forth herein.

183.    Through his ownership interests in CETTEEN, H&P and ESSPEN, as well as the investment made by him and through one or more of those entities in VEC, Jafari has been unjustly enriched at the expense of Plaintiffs.

184.    Under the JVA, Varex paid a total of €4 million to VEC upon reaching certain milestones.

185.    In addition, Varex made substantial investments in the joint venture that went far beyond the investments agreed to in the JVA, based on the understanding that those amounts would benefit the joint venture.

186.    For example, Varex made capital contributions to VEC totaling millions of dollars.

187.    In addition, Varex granted several loans to VEC—which was operated by Jafari for his own benefit, and to the detriment of Varex—believing those sums were necessary to prevent the joint venture from the persistent risk of insolvency.

   a.   In October 2020, Varex provided a loan in the amount of €126,000 to VEC.

   b.   In January 2021, Varex provided a loan in the amount of €250,000 to VEC.

   c.   In March 2021, Varex provided a loan in the amount of €100,000 to VEC.

   d.   In June 2021, Varex provided a loan in the amount of €200,000 to VEC; that loan has never been repaid.

e.   In January 2022, Varex provided a loan in the amount of €250,000 to VEC; that

loan has never been repaid.

To date, approximately €535,000 of these loans are past due and still outstanding, including

interest.

188.   Varex also agreed to have its IP lawyers perform work for VEC, and agreed rates

for which VEC was later invoiced.  The value of those legal services totals at least $25,000, a

balance that remains unpaid.

189.   In addition, under the JVA, Varex provided VEC with the equivalent of four full-

time employees (full time equivalents or "FTEs") for a period of three years to support it in the

development and production of prototypes.  Varex continued to assign employees to VEC projects

for more than nine months after the expiration of that three-year contractual period.  VEC has

never compensated Varex for any costs related to those employees once the contractual three-year

period expired.  As a result, Jafari and his companies have been unjustly enriched by the labor and

related costs provided by Varex.

190.   The parties further agreed that the prototypes for the proposed tubes should be

manufactured by Varex, but VEC would pay for the manufacturing costs associated with creating

the prototypes.  Varex has invoiced VEC a total of $121,487.48 (as of December 31, 2023) for

those costs.  VEC—which Jafari operated and managed for his own illicit gain—has failed to pay

any of these invoices and Jafari therefore has been unjustly enriched at the expense of Varex.

191.   Jafari never intended for the joint venture to be successful.  Instead, he used the

guise of the joint venture to misappropriate intellectual property and capital from Varex.

192.     As a result of VEC's non-payment, Varex has incurred at least $1.2 million in damages: approximately €535,000 in outstanding loans and interest, $121,487.48 relating to unpaid prototype invoices, $25,000 related to IP legal services invoices, and $487,125.12 related to unpaid costs for FTEs assigned by Varex to VEC beyond the contractual three-year period.  The precise amount of damages is to be proven at trial.

### SIXTH CAUSE OF ACTION
### Copyright Infringement (17 U.S.C. § 506(a)(1)) (against Jafari, CETTEEN)

193.     The allegations in paragraphs 1 through 192 of the Complaint are repeated and re-alleged as though fully set forth herein.

194.     In connection with Varex's business, including designing and manufacturing x-ray tubes for medical and security related applications, Varex develops and owns a significant amount of intellectual property and trade secrets, including drawings of its proprietary designs.

195.     Varex relies on its proprietary technology and intellectual property—including drawings and renderings of its designs—as the basis for the products it develops, markets, manufactures and sells.

196.     In connection with work performed for Smiths under the Smiths Development Agreement, VEC, Smiths and Varex executed a non-disclosure agreement to protect trade secrets and confidential and proprietary information disclosed in connection with work under (and in the diligence period leading up to) that Agreement.

197.     In connection with work performed under the Smiths Development Agreement, and pursuant to the terms of the Smiths NDA, Varex shared proprietary and confidential information with VEC, which included Jafari as its Managing Director.

198.    Jafari misappropriated the Varex IP shared under and pursuant to the terms of the Smiths NDA, and shared Varex designs, or designs based on Varex IP that had been reverse-engineered, with third-party supplier Wesgo.

199.    Wesgo was not a party to the Smiths NDA.

200.    Wesgo was not involved in any work performed for Smiths in connection with the Smiths Development Agreement.

201.    Varex did not provide permission for the drawings and IP shared with Jafari and VEC under the Smiths NDA, or otherwise, to be sent to or disclosed to Wesgo.

202.    Defendants' criminal copyright infringement of Varex's intellectual property was conducted for the purposes of commercial advantage or private financial gain.

203.    Defendants' criminal copyright infringement of Varex's intellectual property has directly and proximately caused damages to Varex and its business, and Varex is entitled to actual damages in an amount to be proven at trial.

### SEVENTH CAUSE OF ACTION
### Tortious Interference (against Jafari)

204.    The allegations in paragraphs 1 through 203 of the Complaint are repeated and re-alleged as though fully set forth herein.

205.    Prior to entry into the VEC joint venture, Varex had longstanding relationships with Smiths, among many other customers.

206.    VEC decided to partner with Smiths because VEC believed it would assist the joint venture.

207.    VEC subsequently entered into manufacturing contracts with Smiths.

208.    As a result of Jafari's purposeful mismanagement, VEC did not meet its obligations under the Smiths Agreement and prevented Varex from fulfilling any of its obligations in connection with that contract.

209.    As a result of VEC's performance failures under the Smiths Agreement, Smiths canceled its manufacturing contract with VEC.

210.    Jafari tortiously interfered with the Smiths Agreement and relationship through improper means, including but not limited to issuing misrepresentations and disparaging falsehoods about Varex.  For example, Jafari made intentionally false statements about Varex's behavior, performance, and quality of equipment to tarnish the character of Varex's operations and reputation and to damage its business relationship with Smiths.  In correspondence with Smiths, Jafari falsely stated that Varex was  being uncooperative and unreasonable and does not adhere to "industry-standard quality objectives and pre-agreed acceptance criteria for delivery."  VEC also falsely blamed Varex for failing to meet its own delivery deadlines, stating that Varex had issues with production and quality at Varex's main production site in Salt Lake City, and that Varex did not have "suitable equipment and production machinery" to comply with the terms of the Smiths Agreement.

211.    Jafari also caused other individuals, including VEC executives, to blame Varex for those performance failures, constituting further improper means.

212.    As a result of Jafari's lies to Smiths, and the lies of others at Jafari's instruction, Varex's relationship with Smiths—a long-time customer of Varex, and with which Varex had a pre-existing economic relationship—has been damaged.

213.    Varex has been injured in amounts to be determined at trial.

## JURY DEMAND

214.   Varex requests a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court find in their favor and against Defendants Houman Jafari, CETTEEN, H&P, ESSPEN, and H&S and that the Court grant the following relief:

A) The Court enter a judgment against Defendants finding that Defendants have:

    a. engaged in acts or practices that violate the Racketeer Influenced and Corrupt Organizations Act;

    b. fraudulently induced Varex to work with Varex Germany to enter into the JVA;

    c. misappropriated trade secrets under 18 U.S.C. § 1836;

    d. misappropriated trade secrets under Utah Code Ann. § 13-24-1;

    e. committed criminal copyright infringement under 17 U.S.C. § 506(a)(1);

    f. were unjustly enriched; and

    g. tortiously interfered with Plaintiff's existing business relationships.

B) That the Court award Varex all general, actual, and special damages, including exemplary, treble, and punitive damages that Varex has sustained and will sustain as a consequence of Defendants' unlawful acts, all in an amount to be proved at trial;

C) That the Court award Varex all reasonable costs incurred in prosecuting this action, including reasonable attorneys' fees;

D) That the Court award Varex pre- and post-judgment interest; and

E) That the Court grant Varex such further relief as the Court considers just and equitable.

Dated: October 22, 2024

/s/ Grace Pusavat

Stephen Wood
Grace Pusavat
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
(801) 515-7300
stephenwood@quinnemanuel.com
gracepusavat@quinnemanuel.com


David Y. Livshiz*
Linda H. Martin*
Timothy T. Howard*
Noelle Williams*
**FRESHFIELDS US LLP**
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
Telephone: (212) 277-4000
Facsimile: (212) 277-4001
david.livshiz@freshfields.com
linda.martin@freshfields.com
timothy.howard@freshfields.com
noelle.williams@freshfields.com
*Pro Hac Vice* Forthcoming

*Attorneys for Varex Imaging Corporation and
Varex Imaging Deutschland AG*